Rel: May 19, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

_____

### SC-2022-0930

_____

**Ohio Valley Conference**

**v.**

**Randall Jones, individually and in his official capacity as Chair of the Board of Trustees of Jacksonville State University, and Don C. Killingsworth, Jr., individually and in his official capacity as President of Jacksonville State University**

**Appeal from Calhoun Circuit Court
(CV-21-900312)**

MENDHEIM, Justice.

The Ohio Valley Conference ("the OVC") appeals from the judgment

dismissing its official-capacity and individual-capacity claims against

Randall Jones, the Chair of the Board of Trustees of Jacksonville State University, and Don C. Killingsworth, Jr., the President of Jacksonville State University.[1] We affirm in part, reverse in part, and remand.

## I. Facts

The OVC is a men's and women's collegiate athletic conference that began in 1948. Since its inception, the OVC has been governed by a Board of Presidents made up of the chancellors and presidents of the OVC's member institutions. Jacksonville State University ("JSU") became a member institution in 2003. The OVC Constitution contains two relevant provisions concerning resignation of membership from the conference:

> "4.5.3 Resignation of Membership. A member institution desiring to terminate its Conference membership shall provide written notice to the Conference president and commissioner a minimum of two years prior to when the member desires to cease Conference membership. Notification must be made no later than the date of the annual OVC Spring Meetings. The member institution providing notice of its termination need not show cause for its termination to be effective. A member institution providing the requisite notice of its intention to resign from the Conference shall pay a $750,000 exit fee plus forfeit both its

---

[1]As we will explain more fully in the rendition of the facts, Jacksonville State University was originally designated as an appellee in this appeal. However, on November 21, 2022, the OVC filed a "Motion for Voluntary Dismissal of Jacksonville State University as Appellee." On December 1, 2022, this Court granted that motion, dismissing Jacksonville State University as an appellee.

Conference year-end and OVC basketball pool distributions during the final two years of OVC membership. A member institution failing to provide the minimum two years required written notice shall pay the Conference a sum of $1,000,000 in addition to forfeiting both its Conference year end and OVC Basketball Pool distributions during the final year of OVC membership. A member institution that resigns from the Conference shall pay at least half of the required exit fee at the time of departure from the Conference, no later than June 30 of that year, and the remaining amount within 12-months of the initial payment, not later than June 30 of the next year …."

"4.5.4 Effect on Pro-Rata Share. A member who resigns or is terminated from the Conference shall forfeit its pro-rata share of the Conference Fund Balance."[2]

In its complaint, the OVC alleged:

"25. Over time, OVC members, including [JSU], have voted to amend Article 4.5.3. For example, in 2004 -- when [JSU] was an OVC member -- the Board of Presidents voted to increase the exit fee to $200,000. In 2011, [JSU] joined a unanimous vote to add to Article 4.5.3 of the OVC Constitution forfeiture of Conference distributions during the final two years of membership. In 2013, [JSU] joined a unanimous vote to increase the exit fee to $500,000 upon two years' notice and $750,000 with less than two years' notice. In 2015, [JSU] joined a unanimous vote to increase the exit fee to its current amount. In 2017, [JSU] joined a unanimous vote

---

[2]Article 4 of the OVC Constitution is attached as an exhibit to the OVC's complaint. Under Rule 10(c), Ala. R. Civ. P., documents attached to and referenced in the complaint become a part of the pleading. See, e.g., Ex parte Price, 244 So. 3d 949, 955 (Ala. 2017) (noting that "[e]xhibits attached to a pleading become part of the pleading," citing Rule 10(c)).

3

to make 50% of the exit fee due immediately upon a school's departure.

"....

"32. On January 26, 2021, [JSU's] Board of Trustees unanimously approved Resolution 621 authorizing President Killingsworth 'to explore opportunities for [JSU] to join another NCAA Division I athletic conference and if, in the exercise of his good faith discretion, he believes a new conference affiliation is in the best interest of [JSU], to enter into such agreement and to take the necessary steps for [JSU] to resign its membership in the OVC.'

"33. On February 3, 2021, [JSU] informed the OVC that it intended to resign its OVC membership effective June 30, 2021. …

"....

"39. [JSU] did not pay the $500,000 portion of the exit fee due on June 30, 2021. By letter dated June 29, 2021, [JSU] stated it had no intention of paying the exit fee."

In addition to alleging that JSU had failed to pay the conference-resignation fee described in Article 4.5.3 of the OVC Constitution, the OVC also asserted that JSU

"owes $15,000 to the OVC for tickets that the OVC provided [JSU] for the OVC's 2021 conference championship basketball tournament. The $15,000 payment is for a ticket buy-in that all OVC schools owe to help support the conference championship event, regardless of whether they have a team in the tournament. [JSU] received $15,000 in tickets from the OVC and had both men's and women's teams in the

4

tournament. A copy of the invoice to [JSU] is attached as Exhibit C and incorporated herein by reference."

On August 3, 2021, the OVC commenced this action in the Calhoun Circuit Court against JSU, against Jones, individually and in his capacity as chair of the JSU Board of Trustees, and against Killingsworth, individually and in his capacity as president of JSU. The OVC asserted two counts against JSU -- declaratory judgment and breach of contract -- that focused solely on JSU's failure to pay the conference-resignation fee described in Article 4.5.3 of the OVC Constitution. The complaint also asserted one count against JSU -- conversion -- that focused solely on the OVC's allegation that JSU had failed to pay $15,000 for tickets received from the OVC for the OVC's 2021 conference championship basketball tournament. The complaint also asserted two counts against JSU -- promissory estoppel and unjust enrichment -- that incorporated both the conference-resignation fee and the value of the tickets to the conference championship basketball tournament as elements of damages. Finally, the OVC asserted one count for "Injunctive Relief" against JSU, Jones, and Killingsworth that stated:

"82. Jones and Killingsworth had the responsibility to follow established procedures for the payment of [JSU's] contractual obligations and debts due and owing, and also to

follow guidelines and established accounting procedures to ensure that established obligations, such as those owed to the OVC, were paid. Jones and Killingsworth failed to meet these responsibilities or follow these guidelines and established accounting procedures. These acts and omissions constitute violations of ministerial, rather than discretionary, duties.

"83. To the extent that these acts and omissions could conceivably have been done while Jones and Killingsworth were exercising a discretionary function, then the act or omission was done willfully, maliciously, intentionally, in bad faith, beyond the authority of Jones or Killingsworth, or under a mistaken interpretation of the law. Otherwise, the acts or omissions complained of herein involved ministerial acts that were improperly performed by Jones or Killingsworth, or at their direction.

"84. The OVC seeks a writ of mandamus, injunctive relief, or other relief to which it may be equitably entitled, including but not limited to:

"a. The enjoinment of [JSU] from leaving the OVC until it has fulfilled its contractual and equitable obligations;

"b. an order compelling [JSU], Jones, and Killingsworth to perform the ministerial duty of causing payment to issue to the OVC.

"WHEREFORE, the premises considered, the OVC respectively requests the equitable remedy of enjoining [JSU], Jones, and Killingsworth to pay the debt owed and compensatory damages in the amount to be determined by the Court, plus pre-judgment interest and post-judgment interest at the maximum allowable rates; attorneys' fees, costs, and expenses, where permitted; and all such other and further relief as the Court deems proper."

On September 10, 2021, JSU, Jones, and Killingsworth filed a joint motion to dismiss the OVC's complaint and a memorandum in support thereof. With respect to the OVC's claims against JSU, the defendants argued that the Alabama State Board of Adjustment ("the BOA") had "exclusive jurisdiction" over those claims. With respect to any claims the OVC asserted against Jones and Killingsworth in their official capacities, the defendants argued that the claims were barred by State immunity under § 14 of the Alabama Constitution. See Ala. Const. 1901 (Off. Recomp.), Art. I, § 14 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity."). With respect to any claims the OVC asserted against Jones and Killingsworth in their individual capacities, the defendants argued that the OVC had failed to state a claim upon which relief could be granted, and they maintained that the claims were barred by the doctrine of State-agent immunity, which was restated by a plurality of this Court in Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), and adopted by a majority of this Court in Ex parte Butts, 775 So. 2d 173 (Ala. 2000).

On October 17, 2021, the OVC filed a response to the motion to dismiss. Concerning its claims against Jones and Killingsworth in their

7

official capacities, the OVC contended that State immunity did not apply because the OVC sought to compel Jones and/or Killingsworth to perform their legal duties or to perform ministerial acts. Concerning its claims against Jones and Killingsworth in their individual capacities, the OVC argued that its allegations that Jones and Killingsworth had acted willfully, maliciously, intentionally, in bad faith, beyond their authority, or under a mistaken interpretation of law "[t]o the extent that [their] acts and omissions could conceivably have been done while Jones and Killingsworth were exercising a discretionary function" were sufficient to warrant discovery.

On September 6, 2022, the circuit court held a hearing on the joint motion to dismiss filed by JSU, Jones, and Killingsworth. At the conclusion of that hearing, the circuit court stated:

> "THE COURT: Okay. I have read all of this. I know this is a very important case to all of you, but I am afraid after we spend a lot of time and a lot of money, I am going to reach the same decision on the Rule 56[, Ala. R. Civ. P., summary-judgment motion]. I just don't know -- it [immunity] is such a high, high burden. I don't know how you are going to overcome it.
>
> "So I am going to grant the Motion to Dismiss, and I wish you well in the Board of Adjustments."

On the same day, September 6, 2022, the circuit court entered a judgment confirming that it was granting the motion to dismiss: "This case came before the Court on this date for hearing upon Defendants' Motion to Dismiss. After hearing and in consideration of the applicable law, this case is hereby dismissed."

On October 20, 2022, the OVC appealed the circuit court's judgment with respect to all the defendants. On November 21, 2022, the OVC filed with this Court a "Motion for Voluntary Dismissal of Jacksonville State University as Appellee." In that motion, the OVC stated that it

> "no longer wishes to appeal the trial court's dismissal of its suit as it relates to JSU. The claim against JSU is properly within the jurisdiction of the Alabama Board of Adjustment ('BOA') and has been properly asserted and is pending there to be activated on resolution of this litigation.
>
> "....
>
> "4. OVC filed the underlying lawsuit on August 3, 2021. Thereafter, on June 28, 2022, OVC also filed a claim against JSU with the [BOA] by making a protective filing given the BOA's one-year statute of limitations on claims.
>
> "5. The claim is pending in the BOA with Claim No. 244-2022101. On June 28, 2022, the BOA advised that OVC's claim is being held in abeyance pending resolution of this litigation 'which relates to the same facts from which this claim arises.'

"6. Pursuant to BOA Rule 22(b), OVC's claim will not be scheduled for hearing while litigation pertaining to the same facts is pending in the Alabama courts. The BOA is expected to allow its claims process to be activated upon the resolution of this litigation.

"7. OVC seeks dismissal of JSU only from this appeal because OVC's claim against JSU is properly within the jurisdiction of the BOA. Hawkins v. Bd. of Adjustment, 242 Ala. 547, 7 So. 2d 775 (1942)."

On December 1, 2022, this Court granted the OVC's motion, dismissing JSU as an appellee. Consequently, only the judgment insofar as it dismisses the claims asserted against Jones and Killingsworth in their official and individual capacities is before us for review in this appeal.

## II. Standard of Review

As we noted in the rendition of the facts, the OVC asserts claims against Jones and Killingsworth in their official and individual capacities. In the circuit court, Jones and Killingsworth contended that the official-capacity claims were barred by State immunity; they argued that the individual-capacity claims failed to state a claim upon which relief could be granted and that they were barred by State-agent immunity.

10

When State immunity applies, "it 'divests the trial courts of this State of subject-matter jurisdiction.'" Butler v. Parks, 337 So. 3d 1178, 1182 (Ala. 2021) (quoting Alabama State Univ. v. Danley, 212 So. 3d 112, 127 (Ala. 2016)). "'We review de novo whether the trial court had subject-matter jurisdiction.'" Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 986 (Ala. 2017) (quoting Solomon v. Liberty Nat'l Life Ins. Co., 953 So. 2d 1211, 1218 (Ala. 2006)).

> "'"The appropriate standard of review under Rule 12(b)(6)[, Ala. R. Civ. P.,] is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [it] to relief. In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether [it] may possibly prevail. We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."'"

Ex parte Troy Univ., 961 So. 2d 105, 108 (Ala. 2006) (quoting Knox v. Western World Ins. Co., 893 So. 2d 321, 322 (Ala. 2004), quoting in turn Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993)). "A ruling on a motion to dismiss is reviewed without a presumption of correctness." Newman v. Savas, 878 So. 2d 1147, 1148-49 (Ala. 2003).

11

## III. Analysis

We will first address the official-capacity claims, and we will then address the individual-capacity claims.

## A. Official-Capacity Claims Against Jones and Killingsworth

The OVC contends that the circuit court erred in concluding that its official-capacity claims against Jones and Killingsworth were barred by State immunity because, it says, those claims fall within so-called "exceptions" to State immunity that do not constitute claims against the State.

> "The wall of immunity erected by § 14 is nearly impregnable. Sanders Lead Co. v. Levine, 370 F. Supp. 1115, 1117 (M.D. Ala. 1973); Taylor v. Troy State Univ., 437 So. 2d 472, 474 (Ala. 1983); Hutchinson v. Board of Trustees of Univ. of Alabama, 288 Ala. 20, 24, 256 So. 2d 281, 284 (1971). This immunity may not be waived. Larkins v. Department of Mental Health & Mental Retardation, 806 So. 2d 358, 363 (Ala. 2001) ('The State is immune from suit, and its immunity cannot be waived by the Legislature or by any other State authority.'); Druid City Hosp. Bd. v. Epperson, 378 So. 2d 696 (Ala. 1979) (same); Opinion of the Justices No. 69, 247 Ala. 195, 23 So. 2d 505 (1945) (same); see also Dunn Constr. Co. v. State Bd. of Adjustment, 234 Ala. 372, 175 So. 383 (1937). 'This means not only that the state itself may not be sued, but that this cannot be indirectly accomplished by suing its officers or agents in their official capacity, when a result favorable to plaintiff would be directly to affect the financial status of the state treasury.' State Docks Comm'n v. Barnes, 225 Ala. 403, 405, 143 So. 581, 582 (1932) (emphasis added);

see also Southall v. Stricos Corp., 275 Ala. 156, 153 So. 2d 234 (1963)."

Patterson v. Gladwin Corp., 835 So. 2d 137, 142 (Ala. 2002).

"'Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State. Lyons v. River Road Constr., Inc., 858 So. 2d 257, 261 (Ala. 2003); Mitchell v. Davis, 598 So. 2d 801, 806 (Ala. 1992). "In determining whether an action against a state officer or employee is, in fact, one against the State, [a] [c]ourt will consider such factors as the nature of the action and the relief sought." Phillips v. Thomas, 555 So. 2d 81, 83 (Ala. 1989). Such factors include whether "a result favorable to the plaintiff would directly affect a contract or property right of the State," Mitchell, 598 So. 2d at 806, whether the defendant is simply a "conduit" through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So. 2d 770, 784 (Ala. 1988), and whether "a judgment against the officer would directly affect the financial status of the State treasury," Lyons, 858 So. 2d at 261. Moreover, we note that claims against state officers in their official capacity are "functionally equivalent" to claims against the entity they represent. Hinson v. Holt, 776 So. 2d 804, 810 (Ala. Civ. App. 1998); see also McMillian v. Monroe County, Ala., 520 U.S. 781, 785 n.2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (noting that a suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent); Yeldell v. Cooper Green Hosp., Inc., 956 F.2d 1056, 1060 (11th Cir. 1992) (holding that official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent). ...'"

Ex parte Wilcox Cnty. Bd. of Educ., 285 So. 3d 765, 776 (Ala. 2019)

(quoting Haley v. Barbour Cnty., 885 So. 2d 783, 788 (Ala. 2004)).

13

> "'Alabama A & M University is an instrumentality of the State of Alabama and, thus, is absolutely immune from suit under § 14.' Matthews v. Alabama Agric. & Mech. Univ., 787 So. 2d 691, 696 (Ala. 2000). Accord Ex parte Craft, 727 So. 2d 55, 58 (Ala. 1999); Rigby v. Auburn Univ., 448 So. 2d 345, 347 (Ala. 1984); Taylor v. Troy State Univ., 437 So. 2d 472, 474 (Ala. 1983). Thus, actions against officers, trustees, and employees of state universities in their official capacities are likewise barred by § 14."

Alabama Agric. & Mech. Univ. v. Jones, 895 So. 2d 867, 873 (Ala. 2004).

Jones and Killingsworth rely upon the principles provided in the above-quoted cases in arguing that the OVC's official-capacity claims against them are functionally equivalent to claims against the State because the OVC is using Jones and Killingsworth as conduits for forcing JSU to pay the conference-resignation fee described in Article 4.5.3 of the OVC Constitution and to reimburse the OVC $15,000 for tickets JSU received from the OVC for the OVC's 2021 conference championship basketball tournament. In short, they contend that the OVC is attempting to accomplish indirectly by suing Jones and Killingsworth in their official capacities what the OVC cannot do directly by suing JSU because a result favorable to the OVC would affect the financial status of the state treasury.

14

The OVC concedes that it cannot sue JSU in the courts of this state for monetary relief; indeed, that is why it dismissed the appeal of the judgment insofar as it dismissed OVC's claims against JSU on the ground that those claims are "properly within the jurisdiction of the Alabama [State] Board of Adjustment." However, the OVC insists that its official-capacity claims against Jones and Killingsworth are not protected by § 14 of the Alabama Constitution.

> "'[C]ertain actions are not barred by § 14. There are six general categories of actions that do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; (4) actions brought against State officials under the Declaratory Judgments Act, Ala. Code 1975, § 6-6-220 et seq., seeking construction of a statute and its application in a given situation; (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law. See Drummond Co. v. Alabama Dep't of Transp., 937 So. 2d 56, 58 (Ala. 2006) (quoting Ex parte Carter, 395 So. 2d 65, 68 (Ala. 1980)); Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So. 2d 831 (Ala. 2008) (holding that the exception for

15

declaratory-judgment actions applies only to actions against State officials). As we confirmed in Harbert, these "exceptions" to sovereign immunity apply only to actions brought against State officials; they do not apply to actions against the State or against State agencies. See Alabama Dep't of Transp., 990 So. 2d at 840-41.'

"Ex parte Alabama Dep't of Fin., 991 So. 2d 1254, 1256-57 (Ala. 2008). The sixth 'exception' to § 14 immunity was restated in Ex parte Moulton, 116 So. 3d 1119, 1141 (Ala. 2013), as follows:

"'(6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, Wallace v. Board of Education of Montgomery County, 280 Ala. 635, 197 So. 2d 428 (1967), and (b) actions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State. Phillips v. Thomas, 555 So. 2d 81, 83 (Ala. 1989).'"[3]

Ex parte Hampton, 189 So. 3d 14, 17-18 (Ala. 2015) (emphasis added).

---

[3]As the Court previously has noted: "These actions are sometimes referred to as 'exceptions' to § 14; however, in actuality these actions are simply not considered to be actions '"against the State" for § 14 purposes.' Patterson v. Gladwin Corp., 835 So. 2d 137, 142 (Ala. 2002)." Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So. 2d 831, 840 (Ala. 2008), abrogated on other grounds by Ex parte Moulton, 116 So. 3d 1119 (Ala. 2013).

The OVC contends that the situation presented in this case "falls squarely within" category (1) -- an action to compel state officials to perform their legal duties -- or within category (3) -- an action to compel state officials to perform ministerial acts. The OVC's brief, p. 21. In support of that argument, the OVC attempts to draw parallels between the facts in this case and those in State Highway Department v. Milton Construction Co., 586 So. 2d 872 (Ala. 1991) ("Milton Construction II"), State Board of Administration v. Roquemore, 218 Ala. 120, 117 So. 757 (1928), and Marous Bros. Construction, LLC v. Alabama State University, 533 F. Supp. 2d 1199 (M.D. Ala. 2008). This Court has commented that

> "the takeaway from Milton Construction [II] and Marous Brothers is that once the State has contracted for services and has accepted those services, it is legally obligated to pay for those services, and a claim seeking to enforce that legal obligation falls within the parameters of the first 'exception' to § 14 immunity."

Alabama State Univ. v. Danley, 212 So. 3d 112, 127 (Ala. 2016). Similarly, the Court has stated that

> "in Roquemore, Hardin[ v. Fullilove Excavating Co., 353 So. 2d 779 (Ala. 1977)], and Dampier[ v. Pegues, 362 So. 2d 224 (Ala. 1978)], the writ of mandamus issued, as McDowell-Purcell[, Inc. v. Bass, 370 So. 2d 942 (Ala. 1979),] explains, only after the discretion of state officials had been exhausted.

17

Consequently, <u>mandamus was, in those cases, an available remedy to compel state agents to perform the essentially ministerial act of rendering payment for goods or services accepted</u>. Cf. <u>State of Alabama Highway Dep't v. Milton Constr. Co.</u>, 586 So. 2d 872 (Ala. 1991) (State Highway Department had no right to withhold payment from a construction company under a contractual clause held in an earlier opinion by this Court to be a void penalty provision)."

<u>Jones</u>, 895 So. 2d at 881 (emphasis added). In short, regardless of whether the action at issue is permissible under category (1) or category (3), this Court has held that a court order is available to compel state officials to pay for goods or services that the particular state entity involved in the transaction had accepted.

In its complaint, the OVC discussed "goods and services" that JSU allegedly had received because of its membership in the OVC:

"19. Each year of its OVC membership, [JSU] received continuous goods and services, including monetary benefits, as a result of its membership. Many of the goods and services are available only to an institution that is a member of a National Collegiate Athletics Association ('NCAA') Division I conference. It is nearly impossible for a school to function within the Division I athletics structure without being a member of a conference. In fact, schools transitioning into Division I must now do so through a conference.

"20. As a result of its OVC membership, among other goods and services, [JSU] received (a) organized, conference-based athletic competitions; (b) the opportunity to compete for individual and team conference championship titles, prestige, and bragging rights, such as OVC Commissioner's Cups;

18

(c) the opportunity to compete for NCAA championships automatically by winning OVC conference championships or by receiving an at-large selection, including the NCAA men's (March Madness) and women's basketball tournament; (d) access to the NCAA governance structure (which is limited to schools affiliated with NCAA Division I multisport conferences); (e) administrative and legal support, including scheduling and compliance with NCAA and OVC rules; (f) educational seminars and programming; (g) officiating; (h) digital streaming and replay equipment; (i) media exposure through the OVC's national media partners; (j) the right to market and promote affiliation with the OVC, an esteemed Division I conference; (k) a share of year-end OVC distributions and basketball pool funds; (l) upon approval by the Board of Presidents, a share of revenue from the OVC's contracts with television broadcasters, including the OVC's current contract with ESPN (the biggest in the OVC's history); (m) access to the OVC's sponsorship partnership with Learfield (previously Learfield IMG College); (n) a share of NCAA year-end funds distributed through the OVC; (o) a share of College Football Playoff Grant Funds; (p) competition and academic awards and honors; and (q) in 2020, COVID-19 equipment and supplies.

"21. In particular, basketball pool funds have been a unique benefit received by [JSU] due to its OVC membership. Division I Basketball Performance Funds are monies that the NCAA distributes to conferences for their members' success in the Division I men's basketball tournament. Each win in the Division I men's basketball tournament equates to a 'unit' of Division I Basketball Performance Funds. Conferences -- not the NCAA -- determine how Division I Basketball Performance Funds received from the NCAA are distributed to their conference members. The OVC distributes Division I Basketball Performance Funds to all its members, regardless [of] which member won the tournament game resulting in the 'unit.' But not every conference distributes Division I Basketball Performance Funds in this way. Because all OVC

19

members receive a share of Division I Basketball Performance Funds distributed to the OVC, [JSU] has received Division I Basketball Performance Funds regardless of whether it won March Madness tournament games."

The OVC contends that "this case involves JSU legally contracting with OVC to receive goods and services and obligating itself to pay a liquidated sum upon exiting the conference. … Thus, JSU became legally obligated to pay the exit fee when it did not comply with the OVC Constitutional provisions regarding departure." The OVC's brief, p. 23.

Jones and Killingsworth argue that the Roquemore/Milton Construction II/Marous Brothers line of cases does not apply in this instance because, they say,

"[t]his case is clearly not one where the OVC is seeking payment for accepted goods and services. The OVC Constitution, which contains the penalty provision, states that the OVC is: 'A voluntary, non-profit association of institutions committed to the conduct and governance of intercollegiate athletics in proper relationship to the mission and values of higher education.' Const., Art. 4.2. It is not a buyer-seller or services contract. The OVC's Complaint itself recognizes that the purpose of the provision is not to pay for goods and services. Instead, the purpose of the provision is 'to compensate the OVC for the effects of a member's departure.' [Paragraph] 1. In other words, the Complaint alleges that the OVC is seeking damages."

Jones and Killingsworth's brief, pp. 19-20 (record citations omitted).

In further support of their argument that the OVC is seeking damages against the State, rather than seeking payment for goods or services received, Jones and Killingsworth note that the OVC's complaint states:

> "30. Exit fee provisions ensure the vitality and longevity of collegiate athletics conferences. They are a critical component of benefits received by member institutions, and they protect the interests of athletic conferences and their members. As but one important example in this case, the exit fee will help offset costs that the OVC has already incurred due to [JSU] resigning its membership."

(Emphasis added.) The complaint also asserts that "[t]he exit fee clause is effectively a liquidated damages provision contained in the OVC Constitution to compensate the OVC for the effects of a member's departure." (Emphasis added.) The OVC expounded upon those statements in its response to the motion to dismiss:

> "The OVC is not limited to recovering only lost net revenue -- indeed, that is the exact reason the exit fee is included in the Constitution. A conference, here the OVC, suffers more than lost revenue. As detailed above, the OVC will suffer from lost opportunity costs, which include revenue-generating opportunities, increased expenses in recruiting a replacement member, loss in reputation, weakened bargaining power, and other elements of damage. Because these damages are hard to quantify, the OVC member institutions chose to memorialize them into the exit fee."

21

Based on the allegations in the OVC's complaint and the arguments it presented to the circuit court, we agree with Jones and Killingsworth that the conference-resignation fee described in Article 4.5.3 of the OVC Constitution does not represent a payment for goods and services JSU accepted for being a member of the OVC in the same way that the plaintiffs in Roquemore, Milton Construction II, and Marous Brothers sought payment for contracted-for goods and services that had been accepted by the State. Instead, as the OVC admits, the conference-resignation fee exists "because resigning membership negatively affects the OVC and causes damages to the conference and other member institutions." The OVC's brief, p. 23.

However, the fact that reimbursement to the OVC for goods and services JSU accepted is not the sole purpose of the conference-resignation fee does not mean that the OVC's claims against Jones and Killingsworth seeking an order for payment of that fee constitute an impermissible action for damages against the State.

> "[T]he trial court can generally, by writ of mandamus, order State officers in certain situations to pay liquidated damages or contractually specified debts. The payment of these certain, liquidated amounts would be only a ministerial act that State officers do not have the discretion to avoid. [Alabama Agric. & Mech. Univ. v.] Jones, 895 So. 2d [867] at 878-79 [(Ala. 2004)];

22

[State Bd. of Admin. v.] Roquemore, 218 Ala. [120] at 124, 117 So. [757] at 760 [(1928)]. Furthermore, although the payment of the funds 'may ultimately touch the State treasury,' Horn v. Dunn Bros., 262 Ala. 404, 410, 79 So. 2d 11, 17 (1955), the payment does not 'affect the financial status of the State treasury,' Lyons [v. River Road Constr., Inc.], 858 So. 2d [257] at 261 [(Ala. 2003)], because the funds 'do not belong to the State,' Alabama Dep't of Envtl. Mgmt. v. Lowndesboro, 950 So. 2d 1180, 1190 n.6 (Ala. Civ. App. 2005) (two-judge opinion), and the State treasury 'suffers no more than it would' had the State officers originally performed their duties and paid the debts. Horn, 262 Ala. at 410, 79 So. 2d at 17. The trial court may not, however, award retroactive relief in the nature of unliquidated damages or compensatory damages, because such relief affects a property or contract right of the State. Stark [v. Troy State Univ., 514 So. 2d 46 (Ala. 1987)]; Williams [v. Hank's Ambulance Serv., Inc., 699 So. 2d 1230 (Ala. 1997)]; Roquemore; J.B. McCrary Co. v. Brunson, 204 Ala. 85, 86, 85 So. 396, 396 (1920) ('mandamus will not lie to compel the payment of unliquidated claims'); and Vaughan [v. Sibley, 709 So. 2d 482 (Ala. Civ. App. 1997)]."

Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So. 2d 831, 845-46 (Ala. 2008) (emphasis added).

As we have already noted, the OVC alleged that the conference-resignation fee "is effectively a liquidated damages provision …." There is no dispute between the parties as to the amount of the fee, and there also is no dispute that, if Article 4.5.3 of the OVC Constitution is enforceable, JSU would owe the fee to the OVC. Cf. Woodfin v. Bender, 238 So. 3d 24, 31-32 (Ala. 2017) (plurality opinion) (agreeing with Justice

23

Murdock's observation from his special concurrence in <u>Harbert</u> that the cases discussing "'claims that are "liquidated," when considered in context, are references not merely to claims for amounts that have been reduced to sums certain, but claims as to which there is no room for dispute as to liability, i.e., <u>whether</u> the amounts at issue are owed'" (quoting <u>Harbert</u>, 990 So. 2d at 849 (Murdock, J., concurring specially))).

Jones and Killingsworth strenuously argue that cases that have required state officers to pay contractually obligated liquidated damages as a ministerial act that the officers had no discretion to avoid do not apply in this instance because, they say, "[l]iability is vigorously disputed because the provision on which the OVC relies is an unenforceable penalty. [JSU] (and Jones and Killingsworth) have discretion to refuse to pay a $1,000,000 fee which arises out of an unenforceable penalty provision." Jones and Killingsworth's brief, p. 26.[4] Jones and Killingsworth note that this Court has

> "recognize[d] the well-settled law in Alabama that penalty
> provisions are void as against public policy and that courts are
> '"disposed to lean against any interpretation of a contract
> which will make the provision one for liquidated damages

---

[4]Jones and Killingsworth's brief mentions the term "penalty" in relation to the conference-resignation fee no less than 70 times in its 48 pages.

and, in all cases of doubtful intention, will pronounce the stipulated sum a penalty."' See Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So. 2d 987, 990 (Ala. 1987), quoting Cook v. Brown, 408 So. 2d 143, 144 (Ala. Civ. App. 1981)."

Milton Construction Co. v. State Highway Dep't, 568 So. 2d 784, 789 (Ala. 1990) ("Milton Construction I"), overruled in part on other grounds by Ex parte Alabama Dep't of Transp., 978 So. 2d 17, 23 (Ala. 2007). In their brief, Jones and Killingsworth then proceed to explain why they believe that the conference-resignation fee described in Article 4.5.3 of the OVC Constitution is a penalty rather than a liquidated-damages provision and that, therefore, it is unenforceable.[5] See Jones and Killingsworth's brief, pp. 26-35.

---

[5]The Court in Milton Construction I summarized the legal difference between a penalty and a liquidated-damages provision, and it listed the criteria our courts use for distinguishing between the two:

"A penalty is in essence a security for performance designed to punish one party for breach of contract, whereas a liquidated damages provision is a sum to be paid in lieu of performance (a sum that the parties agree upon as an adequate assessment of damages that would result from a possible breach). See Camelot Music, Inc. v. Marx Realty & Improvement Co., [514 So. 2d 987, 990 (Ala. 1987)]; Cook v. Brown, [408 So. 2d 143, 144 (Ala. Civ. App. 1981)]; see, also, Forsyth v. Central Foundry Co., 240 Ala. 277, 198 So. 706

(1940); <u>Standard Tilton Milling Co. v. Toole</u>, 223 Ala. 450, 137 So. 13 (1931).

> "'Attempts are sometimes made to conceal the fact that the amount specified in a contract is a penalty by using words indicating that the payment is [something else]. There is a borderline along which it is difficult to determine the question; but payment of the specified amount will not be enforced if the court is convinced that it is a penalty the purpose of which was to stimulate performance of a promise to do something else.'

"<u>Restatement of Contracts</u>, § 339 at 554 (1932). …

"Although <u>Camelot Music, Inc. v. Marx Realty & Improvement Co.</u>, supra, established an analysis to determine whether a liquidated damages provision must fail as a penalty, that analysis applies equally well to a determination whether a disincentive clause must fail as a penalty. In <u>Camelot Music, Inc.</u>, supra, we cited three criteria by which a stipulated damages clause may be characterized as liquidated damages as opposed to a penalty:

> "'First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for the damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach estimate of the probable loss.'

"514 So. 2d at 990, citing C. Gamble and D. Corley, <u>Alabama Law of Damages</u> § 5-4 (1982). If one of these three criteria is not met, the clause must fail as a penalty."

568 So. 2d at 790 (emphasis omitted).

26

However, even though the issue whether the conference-resignation fee constitutes a liquidated-damages provision or a penalty that violates public policy appears to be an important one for determining whether JSU is liable to the OVC under Article 4.5.3 of the OVC Constitution, that issue is not before us in this appeal because it concerns the merits of the OVC's claim. See Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So. 2d 987, 990 (Ala. 1987) (noting that "[d]etermining whether a liquidated damages provision is valid is a question of law to be determined by the trial court based on the facts of each case"). At this stage of the litigation, we do not assess the merits of the OVC's claims; we are concerned with whether the OVC's claims against Jones and Killingsworth in their official capacities are barred by State immunity. Cf. Ex parte Thomas, 110 So. 3d 363, 367 (Ala. 2012) (observing that, "[i]n this case, … ACIFA [the Alabama Corrections Institution Finance Authority] and Thomas are essentially arguing that the correctional officers' claims against ACIFA have no basis because, they claim, ACIFA has nothing to do with the manner in which correctional officers are compensated or the funds with which they are compensated. This argument goes to the merits of the correctional

27

officers' claims, and, regardless of whatever merit the argument might have, it does not raise a justiciability issue.").

Moreover, Jones and Killingsworth are simply incorrect that because they dispute the enforceability of the conference-resignation fee described in Article 4.5.3 of the OVC Constitution, the payment of that fee is a matter of discretion rather than a ministerial act that a court may order them to have JSU pay. That same type of argument was presented by the defendants in Barnhart v. Ingalls, 275 So. 3d 1112 (Ala. 2018), with respect to the official-capacity claims asserted against them.[6]

> "In Barnhart, the Alabama Supreme Court considered what it construed as an appeal by three ASSEC [Alabama Space Science Exhibit Commission] officers in their official and individual capacities. The basis of Barnhart was an audit of ASSEC conducted by the Department of Examiners of Public Accounts ('DEPA') in which DEPA discovered that ASSEC had not complied with Alabama law in (1) its payment of annual longevity bonuses to ASSEC employees; and (2) in the manner it compensated ASSEC employees for working on certain state holidays. Id. at 1116 … (citing Ala. Code [1975,] § 36-6-11(a) and § 1-3-8). Representatives of ASSEC maintained, among other things, that the legislation pursuant to which it was created removed it from the purview of certain state employment laws, including the benefits

---

[6]In Ex parte Pinkard, [Ms. 1200658, May 27, 2022] ___ So. 3d ___ (Ala. 2022), this Court overruled the Barnhart Court's conclusion that "any 'individual capacity' claims alleging breach of duties that 'existed solely because of [the officers'] official positions' are substantively claims against the State for purposes of § 14." ___ So. 3d at ___.

> statutes. Plaintiffs, former employees of ASSEC, filed suit against ASSEC and several ASSEC officers, alleging that they had not received all compensation to which they were entitled by statute during their tenures as ASSEC employees. In particular, plaintiffs alleged that they had not been paid the amount of longevity bonuses to which they were entitled when they were ASSEC employees and that they had not been properly compensated for working on state holidays that were not observed at ASSEC."

Alabama Space Sci. Exhibit Comm'n v. Merkel American Ins. Co., 400 F. Supp. 3d 1259, 1263 (N.D. Ala. 2019). With respect to the ASSEC-employee plaintiffs' claim seeking "an award of all moneys previously earned but not paid because of the failure to comply with the benefits statutes ('the retrospective-relief claim')," the ASSEC-officer defendants argued that they were immune based on the doctrine of State immunity. Barnhart, 275 So. 3d at 1118, 1121. The ASSEC-employee plaintiffs' rejoinder -- like the OVC's response in this case -- was that,

> "although that claim seeks the payment of money damages, the claim is, they say, at its core, simply an attempt to compel State officials to perform their legal duty or a ministerial act -- that duty or act being the payment of money class members are entitled to by the clear terms of the benefits statutes -- and such actions are not barred by § 14."

Id. at 1122. The ASSEC-officer defendants objected -- as Jones and Killingsworth do in this case -- that the cases that have allowed suits against state officers in their official capacities because the payment

29

sought would involve a legal duty or ministerial act did not apply because, they said, "whether the [ASSEC] is subject to the benefit statutes is disputed in this case." Id. at 1123. The Barnhart Court rejected that argument:

> "In contrast, the issue in this case, as in Ex parte Bessemer Board[ of Education, 68 So. 3d 782 (Ala. 2011)], is one of statutory interpretation -- does a statute entitle the plaintiffs to compensation they did not receive. As this Court explained in Ex parte Bessemer Board:
>
> > "'[I]t is undisputed that the Bessemer Board members have a statutory duty to pay [the plaintiff] the appropriate salary increase under § 16-22-13.1, Ala. Code 1975. That statute specifically provides that a public school teacher with [the plaintiff's] years of experience being paid under the State minimum-salary schedule shall receive a 5.5% increase in salary beginning with the fiscal year 2000-2001. The basis for this calculation is at issue in this lawsuit. The amount of the salary increase the Bessemer Board members must pay [the plaintiff] involves obedience to the statute; it does not involve any discretion. The Bessemer Board members have a legal duty to pay [the plaintiff] the correctly calculated salary increase under the statute and in doing so they are performing a ministerial act. Therefore, [the plaintiff's] action against the Bessemer Board members in their official capacities is not an action "against the State" for § 14 purposes; thus, the Bessemer Board members are not entitled to § 14 immunity from [the plaintiff's] action to compel them to fulfill their

30

> statutory duty to pay her the appropriate salary increase.'

> "68 So. 3d at 790-91 (emphasis added). Thus, <u>if the benefit statutes obligated the [ASSEC] officers to pay the named plaintiffs compensation they were not paid, the [ASSEC] officers had no discretion to avoid that requirement; obedience to the statute is mandatory. Any confusion the [ASSEC] officers might have had regarding the interpretation of the benefit statutes, however reasonable, is ultimately immaterial because that confusion cannot serve as the basis for avoiding a statutory requirement.</u> In sum, if it is ultimately determined that the named plaintiffs should have received additional compensation pursuant to the benefit statutes, the [ASSEC] officers had a legal duty to make those payments all along, and in finally doing so they are merely performing a ministerial act. Accordingly, the named plaintiffs' retrospective-relief claim is not barred by § 14."

<u>Barnhart</u>, 275 So. 3d at 1124-25 (final emphasis added).

In sum, in <u>Barnhart</u>, the ASSEC-officer defendants had no discretion to avoid paying the ASSEC-employee plaintiffs' compensation if the compensation statutes applied to the ASSEC, and so the plaintiffs' retrospective-relief claim was not barred by State immunity. Likewise, in this case, Jones and Killingsworth would have no discretion to avoid paying the conference-resignation fee if the conference-resignation fee as described in Article 4.5.3 of the OVC Constitution is enforceable. Any confusion Jones and Killingsworth might have had regarding whether the conference-resignation fee was a penalty rather than a liquidated-

damages provision is immaterial to whether paying the fee is a legal duty or a ministerial act. Consequently, the OVC's official-capacity claims against Jones and Killingsworth based on the conference-resignation fee as described in Article 4.5.3 of the OVC Constitution are not barred by State immunity.

Furthermore, the OVC alleges that JSU's receipt of tickets from the OVC for the OVC's 2021 conference championship basketball tournament valued at $15,000 is in the nature of contracted-for goods that JSU accepted. Indeed, the only argument Jones and Killingsworth offer against the OVC's claim seeking payment for the tickets is that "the OVC has refused to pay [JSU] other sums that are owing despite [JSU's] departure from the [OVC]." Jones and Killingsworth's brief, p. 10. That is a merits-based defense, not one that implicates State immunity. Therefore, under the Roquemore/Milton Construction II/Marous Brothers line of cases, the OVC's official-capacity claims against Jones and Killingsworth seeking $15,000 in reimbursement for the tickets JSU received from the OVC for the OVC's 2021 conference championship basketball tournament are not barred by State immunity.

32

Jones and Killingsworth present one other argument pertaining to the official-capacity claims asserted against them that warrants our attention.

> "As previously noted, the OVC has a claim pending before the Board of Adjustment for the same relief it seeks here -- the payment of a $1,000,000 penalty by [JSU] for leaving the OVC. Despite already having a remedy, the OVC tries to circumvent the Board of Adjustment's exclusive jurisdiction over a contract claim against [JSU] by suing Chairman Jones and President Killingsworth in their official and individual capacities for injunctive relief. The official capacity claims should be dismissed because they are barred by state immunity."

Jones and Killingsworth's brief, p. 13. In essence, Jones and Killingsworth contend that because the OVC has filed a claim against JSU with the BOA, it cannot assert claims against Jones and Killingsworth in their official capacities based on the same cause of action. Put differently, Jones and Killingsworth seem to be asserting that because the OVC concedes that the BOA has jurisdiction over its claims against JSU, the OVC cannot assert claims against Jones and Killingsworth in their official capacities that arise from the same conduct.

Section 41-9-60, Ala. Code 1975, addresses the BOA's purpose:

33

"The purpose of this division [§ 41-9-60 through § 41-9-74, Ala. Code 1975] is to provide a method of payment by the State of Alabama or any of its agencies, commissions, boards, institutions or departments to persons for injuries to person or property or for death occasioned by the State of Alabama or any of its agencies, commissions, boards, institutions or departments where in law, justice or good morals the same should be paid."

Section 41-9-62, Ala. Code 1975, addresses the BOA's jurisdiction

and provides, in pertinent part:

"(a) The Board of Adjustment shall have the power and jurisdiction and it shall be its duty to hear and consider:

"....

"(4) All claims against the State of Alabama or any of its agencies, commissions, boards, institutions or departments arising out of any contract, express or implied, to which the State of Alabama or any of its agencies, commissions, boards, institutions or departments are parties, where there is claimed a legal or moral obligation resting on the state;

"....

"(b) The jurisdiction of the Board of Adjustment is specifically limited to the consideration of the claims enumerated in subsection (a) of this section and no others; provided, that nothing contained in this division shall confer upon the Board of Adjustment any jurisdiction now conferred by law upon the State Board of Compromise provided for in Sections 41-1-3 and 41-1-4, [Ala. Code 1975,] and nothing contained in this division shall be construed to confer jurisdiction upon the Board of Adjustment to settle or adjust

34

any matter or claim of which the courts of this state have or had jurisdiction ...."

(Emphasis added.)

After the BOA was created by the legislature in 1935,[7] this Court discussed the purpose and powers of the BOA in a series of cases, including: Dunn Construction Co. v. State Board of Adjustment, 234 Ala. 372, 175 So. 383 (1937); John E. Ballenger Construction Co. v. State Board of Adjustment, 234 Ala. 377, 175 So. 387 (1937); and Lee v. Cunningham, 234 Ala. 639, 176 So. 477 (1937). In one of those early

---

[7]An Alabama Lawyer article that reviewed the BOA's creation and growth in its early years explained:

"The Alabama State Board of Adjustment owes its existence to two developments which came in the early 1930's. First, an increasing number of relief bills were being presented to the Legislature .... Second, Governor Benjamin Meek Miller was vetoing many of those relief bills which were being passed. There is no record of the actual number of bills vetoed, but investigation reveals ten acts providing relief for injured State employees which were passed over the governor's veto in 1931 and 1932.

"Disturbed by these two developments, Aubrey Dominick, State Representative from Tuscaloosa, introduced a bill establishing the Board, which passed and on September 14, 1935, was approved by Governor Bibb Graves."

H. Ellsworth Steele, The Alabama State Board of Adjustment and the Law, 19 Ala. Law. 397, 397 (1958).

cases, <u>Hawkins v. State Board of Adjustment</u>, 242 Ala. 547, 548, 7 So. 2d

775, 776-77 (1942), this Court explained:

> "The Legislature in th[e] Article of the Code [addressing the authority of the Board of Adjustment] recognizes that there is sometimes a moral obligation which justifies it under the Constitution to appropriate money for certain claims when there is no legal obligation to pay them, but there is a duty to do so in the interest of the general public. <u>State v. Clements</u>, 220 Ala. 515, 126 So. 162 [(1930)]; <u>Board of Revenue and Road Com'rs v. Puckett</u>, 227 Ala. 374, 149 So. 850 [(1933)]; <u>Moses v. Tigner</u>, 232 Ala. 457, 168 So. 194 [(1936)].

> "<u>The authority of the Board of Adjustment is to act for the Legislature on facts found by the board within defined limits, when no court has jurisdiction, but when one of the State agencies has so acted as to create a moral obligation which should be discharged as a public duty. The board does not sit as a court and does not legislate.</u> But the Legislature makes the appropriation and imposes the duty on the board to find facts and draw deductions within defined limitations. The legislative act then operates upon that finding."

(Emphasis added.) See, e.g., <u>Lee</u>, 234 Ala. at 641, 176 So. at 479 ("Our

judgment … is that the legislative purpose disclosed in the act … was to

confer on said board jurisdiction over claims against the state, colorable

legally and morally well grounded, not justiciable in the courts, because

of the state's constitutional immunity from being made a defendant

(Const. 1901, § 14), and to exclude from its jurisdiction claims well

grounded in law or equity, cognizable by the courts …."); <u>Ex parte</u>

<u>Cranman</u>, 792 So. 2d 392, 399 n.9 (Ala. 2000) (plurality opinion) (stating

that "the Board of Adjustment … functions outside the judicial system"

and "extends a measure of compensation or relief when the rule of

sovereign immunity exempts the State and its respective agencies from

suit").

In <u>Dunn Construction</u>, the Court specifically discussed contract-

based claims such as those at issue in this case:

> "The Legislature, as often declared, has authority to make appropriations by way of relief where a moral obligation of a public character has arisen. State Boards of Adjustment may well be set up as a state agency, a factfinding body, with administrative and quasi-judicial powers in the administration of funds appropriated for such relief purposes, the law itself defining the class of claims and the principles of law on which the fund is to be administered.
>
> "As for claims arising from contracts with the state, including contracts through agencies authorized to contract on behalf of the state, it is to be observed that all persons dealing with the state are charged with knowledge that no one has authority to subject the state to suit. Not that the holders of state obligations are without remedy. <u>When an obligation of the state to pay money is created by law, or by contract duly authorized, somewhere there is a duty imposed on a public officer or officers to make payment from the funds appropriated therefor. Performance of such official duty, in a wide range of cases, not necessary to here review, may be compelled by mandamus. This class of claims is evidently intended to be excepted from the jurisdiction of the State Board of Adjustment by the clause in section 2, excluding 'Any</u>

37

matter or claim of which the courts of the State have jurisdiction.'"

234 Ala. at 376, 175 So. at 386 (emphasis added).

From the foregoing, it becomes clear that Jones and Killingsworth's argument invoking the OVC's claim before the BOA misunderstands both the purpose and powers of the BOA. Because the BOA is not a court, "[t]he statutes that created the [BOA], and that enumerate its powers, … do not create a right, but grant a privilege, to have certain types of claims heard." Ex parte Houston Cnty. Bd. of Educ., 562 So. 2d 513, 514 (Ala. 1990). Thus, the fact that the OVC filed a claim with the BOA has no bearing on our determinations that the OVC's claims against Jones and Killingsworth in their official capacities seeking payment for the liquidated amount of the conference-resignation fee and for the value of the tickets JSU received for the OVC's 2021 conference championship basketball tournament do not constitute claims against the State and that, therefore, those claims are not barred by State immunity. It is true that the BOA cannot exercise jurisdiction over claims amenable in our courts, but obviously the OVC's claim with the BOA is not before us.

B. Individual-Capacity Claims Against Jones and Killingsworth

The OVC contends that the circuit court erred in dismissing its individual-capacity claims against Jones and Killingsworth because, the OVC says, it is not obvious from the face of its complaint that Jones and Killingsworth are entitled to State-agent immunity. In support of that contention, the OVC cites and quotes from several cases in which we have noted that

> "a motion to dismiss is typically not the appropriate vehicle by which to assert qualified immunity or State-agent immunity and that normally the determination as to the existence of such a defense should be reserved until the summary-judgment stage, following appropriate discovery. '"[I]t is the rare case involving the defense of [State-agent] immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6), [Ala. R. Civ. P.]."' Ex parte Butts, 775 So. 2d [173] at 177 [(Ala. 2000)], quoting Patton v. Black, 646 So. 2d 8, 10 (Ala. 1994) (quoting earlier cases)."

Ex parte Alabama Dep't of Mental Health & Mental Retardation, 837 So. 2d 808, 813-14 (Ala. 2002).

We readily agree that determinations regarding the applicability of State-agent immunity ordinarily are not appropriate at the motion-to-dismiss stage of litigation. However, the circuit court's judgment dismissing the OVC's claims did not specify the grounds for its decision, and Jones and Killingsworth's first argument in their memorandum in

39

support of the motion to dismiss with respect to the OVC's individual-capacity claims was that the OVC had failed to state claims upon which relief could be granted. They asserted:

> "The only relief sought in Count VI is: (1) an injunction to stop JSU from leaving the OVC, which has already occurred; and (2) an order compelling JSU, 'Killingsworth and Jones to perform the ministerial duty of causing payment to issue to the OVC.'
>
> "In their individual capacities, Jones and Killingsworth lack the authority to make JSU do anything. They only have authority when acting in their official capacities. No true claim is asserted against Jones and Killingsworth in their individual capacities. The individual-capacity claims against them should be dismissed."

Jones and Killingsworth renew that argument in response to the OVC's appeal, stating: "[I]s there any possible basis for claiming that Jones and Killingsworth are personally responsible for an alleged debt of [JSU]? Of course not. The claim was properly dismissed." Jones and Killingsworth's brief, p. 37.

We agree with Jones and Killingsworth. As we noted in the rendition of the facts, the OVC's count that included claims against Jones and Killingsworth -- Count VI -- first alleged that, in their official capacities, Jones and Killingsworth had failed to meet their "responsibility to follow established procedures for the payment of

40

[JSU's] contractual obligations and debts due and owing, and also to follow guidelines and established accounting procedures to ensure that established obligations, such as those owed to the OVC, were paid" and that "[t]hese acts and omissions constitute violations of ministerial, rather than discretionary, duties." In other words, the OVC first alleged official-capacity claims against Jones and Killingsworth.

However, the complaint then alleged:

> "83. <u>To the extent that these acts and omissions could conceivably have been done while Jones and Killingsworth were exercising a discretionary function</u>, then the act or omission was done willfully, maliciously, intentionally, in bad faith, beyond the authority of Jones or Killingsworth, or under a mistaken interpretation of the law. Otherwise, the acts or omissions complained of herein involved ministerial acts that were improperly performed by Jones or Killingsworth, or at their direction."

(Emphasis added.) In other words, the OVC's complaint alleged that Jones and Killingsworth could be held individually liable for their failure to order JSU to pay its alleged contractual obligations and debts to the OVC to the extent that their actions were not sanctioned or authorized by JSU.

Thus, the OVC's complaint is clear that its claims against Jones and Killingsworth were pleaded in the alternative: either Jones's and

41

Killingsworth's actions were ministerial in their official capacities <u>or</u> their actions were taken in their individual capacities and done willfully, maliciously, intentionally, in bad faith, beyond their authority, or under a mistaken interpretation of law. In other words, the OVC's official-capacity and individual-capacity claims against Jones and Killingsworth arose from the same conduct, and Jones and Killingsworth could be acting in only one of those capacities when committing their acts or omissions. We already have concluded in Part A of the "Analysis" portion of this opinion that the OVC's official-capacity claims against Jones and Killingsworth were not barred by State immunity because the OVC alleged that it sought legally required payments from JSU. Jones and/or Killingsworth could authorize such payments on JSU's behalf only in their official capacities. Therefore, because Jones and Killingsworth were acting in their official capacities with respect to their alleged conduct, they could not also be liable for the same conduct in their individual capacities. In other words, as Jones and Killingsworth argue, they owed no duties to the OVC in their individual capacities with respect to the conduct alleged by the OVC. See, e.g., <u>Ex parte Pinkard</u>, ___ So. 3d at ___ (explaining that "<u>Barnhart</u>'s logic may have ultimately led to a correct

42

result (dismissal), but it did so for the wrong reason. <u>Barnhart</u> correctly understood that the [ASSEC] employees' individual-capacity claims were nonstarters because the [ASSEC] officers obviously owed no duty in their individual capacities to pay the employees.").

Moreover, as Jones and Killingsworth observe, although the OVC "use[d] the 'magic words' to allege an individual-capacity claim," i.e., alleged that Jones's and/or Killingsworth's actions were taken willfully, maliciously, intentionally, in bad faith, beyond authority, or under a mistaken interpretation of law, the factual allegations in the OVC's complaint do not support those allegations. Jones and Killingsworth's brief, p. 36. This Court has observed:

> "Although we are required to accept [the plaintiff's] <u>factual</u> allegations as true at this stage of the proceedings, we are not required to accept her <u>conclusory</u> allegations that [the defendant] acted willfully, maliciously, fraudulently, or in bad faith. Rather, to survive [the defendant's] motion to dismiss, [the plaintiff] was required to plead <u>facts</u> that would support those conclusory allegations. <u>See</u> <u>Oxford Asset Mgmt., Ltd. v. Jaharis</u>, 297 F.3d 1182, 1188 (11th Cir. 2002) (noting, on review of the dismissal of a complaint for failure to state a claim, that '[t]he plaintiff's factual allegations are accepted as true' but that 'conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal')."

43

Ex parte Gilland, 274 So. 3d 976, 985 n.3 (Ala. 2018). The facts provided

in the OVC's complaint provide no indication that Jones and/or

Killingsworth acted without JSU's authorization. Indeed, the allegations

indicate the exact opposite:

> "32. On January 26, 2021, [JSU's] Board of Trustees unanimously approved Resolution 621 authorizing President Killingsworth 'to explore opportunities for [JSU] to join another NCAA Division I athletic conference and if, in the exercise of his good faith discretion, he believes a new conference affiliation is in the best interest of [JSU], to enter into such agreement and to take the necessary steps for [JSU] to resign its membership in the OVC.'

> "33. On February 3, 2021, [JSU] informed the OVC that it intended to resign its OVC membership effective June 30, 2021. …"

In its reply brief, the OVC argues that the foregoing allegations

"provided factual bases for plausibly concluding [Jones and

Killingsworth] acted beyond their authority -- JSU officials agreed to the

exit fee provision on numerous occasions and JSU instructed …

Killingsworth to take all necessary steps to resign from the OVC." The

OVC's reply brief, p. 21. In other words, the OVC contends that

Killingsworth willfully failed to pay the conference-resignation fee even

though it was a "necessary step" for JSU to leave the OVC.

44

There are at least two problems with that argument. First, in the circuit court and in its appellate brief, the OVC contended that "payment of the exit fee was one of the 'necessary steps for [JSU] to resign its membership in the OVC'" and, thus, that "such payment was a ministerial duty mandated by the JSU Board resolution." The OVC's brief, p. 27. In other words, the OVC originally used the complaint's allegation concerning Resolution 621 in support of its official-capacity claims against Killingsworth, not in support of its individual-capacity claims. The OVC's reply-brief argument is a new spin on its allegations; thus, we need not consider it. See, e.g., Baldwin Cnty. Elect. Membership Corp. v. City of Fairhope, 999 So. 2d 448, 458 n.12 (Ala. 2008) ("Arguments made for the first time in a reply brief are not properly before this Court.").

The second problem with the OVC's new spin on its factual allegations is that the OVC never alleged in its complaint that the JSU Board of Trustees authorized Killingsworth to pay the conference-resignation fee or to pay for the tickets the OVC provided JSU for the 2021 conference championship basketball tournament. In other words, the OVC's argument adds details to its factual allegations that it never

45

presented in its complaint. On the face of the OVC's complaint, there are no factual allegations that support that Jones and/or Killingsworth acted willfully, maliciously, intentionally, in bad faith, beyond authority, or under a mistaken interpretation of law by not authorizing JSU to make the payments the OVC seeks to recover. The OVC's failure to plead facts that supported its conclusory individual-capacity claims against Jones and Killingsworth constitute another reason that the OVC did not state viable individual-capacity claims.

For the foregoing reasons, we conclude that the circuit court did not err in dismissing the OVC's individual-capacity claims against Jones and Killingsworth.

## IV. Conclusion

The OVC's claims against Jones and Killingsworth in their official capacities seeking payment for the liquidated amount of the conference-resignation fee described in Article 4.5.3 of the OVC Constitution and for the value of the tickets JSU received for the OVC's 2021 conference championship basketball tournament do not constitute claims against the State, and, therefore, they are not barred by State immunity. Accordingly, the circuit court erred in dismissing the OVC's official-

capacity claims against Jones and Killingsworth. However, the OVC failed to state individual-capacity claims against Jones and Killingsworth for which relief could be granted because Jones and Killingsworth lacked any duty apart from their official positions to make the payments the OVC seeks to recover and because the OVC's complaint did not supply the factual allegations necessary to support those individual-capacity claims. Accordingly, we affirm the circuit court's dismissal of the OVC's individual-capacity claims against Jones and Killingsworth.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Wise, Bryan, Sellers, and Stewart, JJ., concur.

Shaw, J., concurs specially, with opinion, which Cook, J., joins.

Mitchell, J., concurs specially, with opinion.

Parker, C.J., concurs in part and concurs in the result, with opinion.

SHAW, Justice (concurring specially).

I fully concur with this Court's opinion. I write specially to note the following.

I agree that the complaint filed by the Ohio Valley Conference ("the OVC") failed to state a claim against Randall Jones and Don C. Killingsworth, Jr., in their individual capacities. Any duty to pay the OVC in this case was created by a contractual relationship between it and Jacksonville State University ("JSU"). Such payment on JSU's behalf would necessarily be performed by its agents, because JSU cannot act except through agents. Cf. Townsend Ford, Inc. v. Auto-Owners Ins. Co., 656 So. 2d 360, 363 (Ala. 1995) ("A corporation is a legal entity, an artificial person, and can only act through agents."). Any performance by JSU's agents, here Jones and Killingsworth, would be taken only in their official capacities: "State officials act for and represent the State only in their official capacities." Ex parte Dickson, 46 So. 3d 468, 474 (Ala. 2010). Alternatively, and for that same reason, an injunction to require Jones and Killingsworth to perform an official act in their individual capacities is by law impossible: "[A] suit for injunctive relief against a State official in his or her individual capacity would be meaningless." Id.

48

I further note that in its count for injunctive relief, the OVC sought compensatory damages and attorneys' fees. To the extent that the OVC sought injunctive relief relating to the remaining official-capacity claims, the authority cited in the main opinion shows that compensatory damages are barred by Art. I, § 14, Ala. Const. 1901 (Off. Recomp.). An award of attorneys' fees is similarly barred. <u>Ex parte Town of Lowndesboro</u>, 950 So. 2d 1203, 1211-12 (Ala. 2006).

Cook, J., concurs.

MITCHELL, Justice (concurring specially).

I agree with Chief Justice Parker that our precedents clearly establish that "a plaintiff's complaint does not have to plead facts to support the exceptions to State-agent-immunity." ___ So. 3d at ___ (Parker, C.J., concurring in part and concurring in the result) (citing Odom v. Helms, 314 So. 3d 220, 229 n.3 (Ala. 2020)). Nonetheless, I understand the majority opinion today to be stating only that plaintiffs who voluntarily inject the issue of State-agent immunity into a complaint should take care to plead facts to support their position. In doing so, the main opinion faithfully applies this Court's decision in Ex parte Gilland, 274 So. 3d 976 (Ala. 2018), which is not inconsistent with Odom in any material respect. Moreover, because the main opinion is correct that Randall Jones and Don C. Killingsworth, Jr., plainly "owed no duties to the [Ohio Valley Conference ('the OVC')] in their individual capacities with respect to the conduct alleged by the OVC," and that the OVC therefore failed to state a claim on which relief can be granted, ___ So. 3d at ___, I concur in full. I write specially only to emphasize that Odom remains precedential and that courts in future cases must abide by its holding that plaintiffs have no obligation to "anticipate a State-agent-

50

immunity defense by pleading with particularity a [State-agent-immunity] exception." 314 So. 3d at 229 n.3.

PARKER, Chief Justice (concurring in part and concurring in the result).

I concur in the main opinion except for its alternative holding that, to survive the State-agent-immunity ground in the motion to dismiss, the complaint had to plead facts to support the exceptions to State-agent immunity. That holding contradicts our soundly reasoned precedent.

We have repeatedly explained that a plaintiff's complaint does not have to plead facts to support the exceptions to State-agent immunity. See Odom v. Helms, 314 So. 3d 220, 229 n.3 (Ala. 2020); Harris v. Hicks, [Ms. 1200717, Aug. 19, 2022] ___ So. 3d ___, ___ (Ala. 2022); Avendano v. Shaw, [Ms. 1210125, Aug. 19, 2022] ___ So. 3d ___, ___ (Ala. 2022) (plurality opinion). This rule flows directly from the procedural principles governing motions to dismiss.

State-agent immunity is not an element of a claim; it is an affirmative defense. See Burton v. Hawkins, [Ms. 1200825, Mar. 11, 2022] ___ So. 3d ___, ___ (Ala. 2022); Ex parte Coleman, 145 So. 3d 751, 753 (Ala. 2013); Ex parte Kennedy, 992 So. 2d 1276, 1279 (Ala. 2008). When a defendant moves to dismiss under Rule 12(b)(6), Ala. R. Civ. P., for failure to state a claim, and bases the motion on an affirmative defense, the defendant must show that the applicability of the defense is

conclusively established by the complaint's own factual allegations. See Ghee v. USAble Mut. Ins. Co., [Ms. 1200485, Mar. 31, 2023] ___ So. 3d ___, ___ (Ala. 2023); Crosslin v. Health Care Auth. of Huntsville, 5 So. 3d 1193, 1195 (Ala. 2008); Jones v. Alfa Mut. Ins. Co., 875 So. 2d 1189, 1193 (Ala. 2003). In other words, the defendant must show not that the plaintiff has failed to "plead out of" the affirmative defense, but that the plaintiff has (perhaps inadvertently) conclusively "pleaded into" the affirmative defense. See generally 5 Charles Alan Wright et al., Federal Practice and Procedure § 1276 (4th ed. 2015). If the motion to dismiss argues that the plaintiff has done so, the plaintiff must then respond by arguing why the complaint's allegations do not conclusively establish that the affirmative defense applies. However, the plaintiff need not have preemptively pleaded in the complaint facts to negate the affirmative defense. See Ex parte Dan River, Inc., 794 So. 2d 386, 387 n.1 (Ala. 2000). To require the plaintiff to have done so would reverse the procedural burden on an affirmative-defense-based motion to dismiss.

Thus, on a motion to dismiss based on the affirmative defense of State-agent immunity, "[t]he plaintiff need not [have] anticipate[d] a State-agent-immunity defense by pleading with particularity a [State-

53

agent-immunity] exception. [Rather], unless the inapplicability of all the [State-agent-immunity] exceptions is clear from the face of the complaint, a motion to dismiss based on State-agent immunity must be denied." Odom, 314 So. 3d at 229 n.3; cf. Ex parte Butts, 775 So. 2d 173, 178 (denying mandamus relief from denial of motion to dismiss based on State-agent immunity, because it was conceivable that one of the State-agent-immunity exceptions applied); Ex parte Department of Mental Health & Mental Retardation, 837 So. 2d 808, 813-14 (Ala. 2002) (same). Indeed, a plaintiff need not plead the State-agent-immunity exceptions at all; again, they are negations of an affirmative defense, not elements of a claim.

This motion-to-dismiss procedure contrasts with the procedure on a motion for a summary judgment based on an affirmative defense. In the summary-judgment procedure, the defendant must initially submit evidence and present argument showing that the affirmative defense applies. See Rentz v. Grant, 934 So. 2d 368, 372 (Ala. 2006). The burden then shifts to the plaintiff to present argument (and if necessary submit evidence) showing that the affirmative defense does not apply. See id. What does this procedure look like when the affirmative defense is State-

agent immunity? "[A] defendant must first make a prima facie showing that, at the time of the conduct giving rise to the claim, he was an agent of the State" and "that the claim is based on one or more of certain categories of conduct by the agent." Odom, 314 So. 3d at 224; see Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006) ("[A] State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity.").

> "If the defendant carries his burden of showing agency and covered conduct, then the plaintiff must show either (1) that non-immunity is required by the federal Constitution or laws; the Alabama Constitution; or Alabama laws, rules, or regulations enacted or promulgated to regulate a governmental agency; or (2) that the agent 'act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'"

Odom, 314 So. 3d at 224 (citation omitted); cf. Reynolds, 946 So. 2d at 452.

There are decisions of this Court, including today's main opinion, that have operated on a premise that a complaint must preemptively negate the State-agent-immunity defense by pleading facts to support an exception. See Ex parte Gilland, 274 So. 3d 976, 982-86 (Ala. 2018); Ex parte Wilcox Cnty. Bd. of Educ., 279 So. 3d 1135, 1145-46 (Ala. 2018) ("Wilcox I"); Ex parte Wilcox Cnty. Bd. of Educ., 285 So. 3d 765, 778-79

55

(Ala. 2019) ("<u>Wilcox II</u>"). Each of those decisions has made one of two errors: either (a) reversing the motion-to-dismiss procedural burden, see <u>Wilcox II</u>; today's main opinion, or (b) conflating the motion-to-dismiss procedure with the summary-judgment procedure, see <u>Gilland</u>; <u>Wilcox I</u>. For the reasons I have explained, each of those decisions is incorrect and should be overruled.

Here, the defendants failed to show that the complaint's allegations conclusively established that none of the State-agent-immunity exceptions applied. The defendants were not entitled to dismissal merely because the plaintiff did not affirmatively plead facts to support one of the exceptions. By faulting the plaintiff for failing to do so, the main opinion ignores our soundly reasoned cases (which the plaintiff cites) and joins the mistaken ones that are due to be overruled.